BENJAMIN B. WAGNER
United States Attorney
R. STEVEN LAPHAM
Assistant U.S. Attorney
PETER WILLIAMS
Special Assistant U.S. Attorney
501 I Street. Suite 10-100
Sacramento, California  95814
Telephone:  (916) 554-2724


IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CR. NO. S-07-096 LKK |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | GOVERNMENT'S TRIAL BRIEF |
| | ) | |
| MARK C. ANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   Wine Embezzlement.. . . . . . . . . . . . . . . . . 2

      B.   Arson.. . . . . . . . . . . . . . . . . . . . . . . 6

      C.   Tax Evasion.. . . . . . . . . . . . . . . . . . . 11

III.  LAW RELATING TO ARSON. . . . . . . . . . . . . . . . . 12

      A.   Elements. . . . . . . . . . . . . . . . . . . . . 12

           1.   Damaged or Destroyed By Fire or Explosive. . . 12

           2.   Interstate Commerce. . . . . . . . . . . . . 13

      B.   Mens Rea. . . . . . . . . . . . . . . . . . . . . 14

IV.   LAW OF MAIL FRAUD. . . . . . . . . . . . . . . . . . . 16

      A.   Elements. . . . . . . . . . . . . . . . . . . . . 16

           1.   Use of the Mails.. . . . . . . . . . . . . . 16

           2.   Scheme to Defraud. . . . . . . . . . . . . . 19

           3.   Intent to Defraud. . . . . . . . . . . . . . 19

V.    LAW RELATING TO INTERSTATE TRANSPORTATION OF
      STOLEN PROPERTY. . . . . . . . . . . . . . . . . . . . 21

      A.   Elements. . . . . . . . . . . . . . . . . . . . . 21

VI.   LAW RELATING TO INCOME TAX EVASION.. . . . . . . . . . 22

      A.   Definition. . . . . . . . . . . . . . . . . . . . 22

      B.   Elements. . . . . . . . . . . . . . . . . . . . . 23

           1.   Tax Deficiency.. . . . . . . . . . . . . . . 23

           2.   Willfulness. . . . . . . . . . . . . . . . . 24

     3.   Affirmative Acts.. . . . . . . . . . . . . 24

VII. ADDITIONAL EVIDENTIARY ISSUES

    A.   Government's Use of Summary Witness.. . . . . . . . 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

Goldberg v. United States,
    789 F.2d 1341 (9th Cir. 1986)......................... 27

Jones v. United States,
    529 U.S. 848 (2000)................................... 13

Lyda v. United States,
    279 F.2d 461 (5th Cir. 1960)......................... 21

Moskal v. United States,
    498 U.S. 103 (1990).................................. 15

Sansone v. United States,
    380 U.S. 343 (1965).............................. 22, 23

Schmuck v. United States,
    489 U.S. 705 (1989).............................. 17, 18

United State v. Pereira,
    347 U.S. 1 (1954)............................ 17, 21, 22

United States v. Agrillo-Ladlad,
    675 F.2d 905 (7th Cir. 1982)......................... 12

United States v. Bailey,
    444 U.S. 394 (1980).................................. 15

United States v. Barton,
    647 F.2d 224 (2d Cir. 1981).......................... 14

United States v. Beecroft,
    608 F.2d 753 (9th Cir. 1979)......................... 20

United States v. Beldin,
    737 F.2d 450 (5th Cir. 1984)......................... 12

United States v. Benny,
    786 F.2d 1410 (9th Cir. 1986)........................ 18

United States v. Black,
    843 F.2d 1456 (D.C. Cir. 1988)................... 23, 24

United States v. Brackenridge,
   590  F.2d 810 (9th Cir. 1979)......................... 18

United States v. Brutzman,
   731 F.2d 1449 (9th Cir. 1984)........................ 17

United States v. Buckley,
   689 F.2d 893 (9th Cir. 1982)......................... 18

United States v. Cloud,
   872 F.2d 846 (9th Cir. 1989)......................... 20

United States v. Dack,
   747 F.2d 1172 (7th Cir. 1984)........................ 22

United States v. Duncan,
   919 F.2d 981 (5th Cir. 1990).................... 26, 27

United States v. Edwards,
   375 F.2d 862 (9th Cir. 1967).................... 24, 25

United States v. Garlick,
   240 F.3d 789 (9th Cir. 2001)......................... 17

United States v. Gil,
   297 F.3d 93 (2d Cir. 2002).......................... 16

United States v. Gomez,
   87 F.3d 1093 (9th Cir. 1996)......................... 13

United States v. Green,
   745 F.2d 1205 (9th Cir. 1985)........................ 19

United States v. Hanley,
   190 F.3d 1017 (9th Cir. 1999).................... 17, 20

United States v. Hubbard,
   96 F.3d 1223 (9th Cir. 1996).................... 17, 18

United States v. Jackson,
   61 F.3d 1386 (9th Cir. 1995)......................... 19

United States v. Jane Doe (R.S.W.),
   136 F.3d 631 (9th Cir. 1998)......................... 15

United States v. LeVeque,
    283 F.3d 1098 (9th Cir. 2002).......................... 20

United States v. Lee,
    726 F.2d 128 (4th Cir. 1984).......................... 12

United States v. Lo,
    231 F.3d 471 (9th Cir. 2000).......................... 19

United States v. Lothian,
    976 F.2d 1257 (9th Cir. 1992).................... 17, 21

United States v. Marabelles,
    724 F.2d 1374 (9th Cir. 1984).................... 23, 24

United States v. Martin,
    63 F.3d 1422 (7th Cir. 1996).......................... 14

United States v. Meyers,
    847 F.2d 1408 (9th Cir. 1988).......................... 26

United States v. Morrow,
    717 F.2d 800 (3d Cir. 1983).......................... 12

United States v. Nance,
    502 F.2d 615 (8th Cir. 1974).......................... 19

United States v. Olson,
    925 F.2d 1170 (9th Cir. 1991).......................... 19

United States v. Osum,
    943 F.2d 1394 (5th Cir. 1991).......................... 27

United States v. Photogrammetric Data Services, Inc.,
    259 F.3d 229 (4th Cir. 2001).......................... 16

United States v. Poliak,
    823 F.2d 371 (9th Cir. 1987).......................... 16

United States v. Reid,
    533 F.2d 1255 (D.C. Cir. 1976)........................ 18

United States v. Renteria,
    557 F.3d 1003 (9th Cir. 2009).................... 13, 14

v

United States v. Rosi,
    27 F.3d 409 (9th Cir. 1994)............................ 21

United States v. Rude,
    88 F.3d 1538 (9th Cir. 1996)...................... 18, 19

United States v. Russell,
    471 U.S. 858 (1985).................................. 13

United States v. Schwanke,
    598 F.2d 575 (10th Cir. 1979)........................ 14

United States v. Sherlin,
    67 F.3d 1208 (6th Cir. 1995)......................... 14

United States v. Shirley,
    884 F.2d 1130 (9th Cir. 1989), ...................... 26

United States v. Simas,
    937 F.2d 459 (9th Cir. 1991)......................... 20

United States v. Spies,
    317 U.S. 492 (1943).................................. 24

United States v. Sweet,
    548 F.2d 198 (7th Cir. 1977)......................... 14

United States v. Triplett.,
    922 F.2d 1174 (5th Cir. 1991)........................ 12

United States v. Woods,
    335 F.3d 993 (9th Cir. 2003)......................... 21

## FEDERAL STATUTES

26 U.S.C. §7201....................................... 23

18 U.S.C. § 2314...................................... 21

18 U.S.C. §81  ....................................... 15

18 U.S.C. §844(i)................................. 12, 13

BENJAMIN B. WAGNER
United States Attorney
R. STEVEN LAPHAM
Assistant U.S. Attorney
PETER WILLIAMS
Special Assistant U.S. Attorney
501 I Street. Suite 10-100
Sacramento, California  95814
Telephone:  (916) 554-2724


IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CR. NO. S-07-096 LKK |
| Plaintiff, ) | |
| ) | |
| v.          ) | GOVERNMENT'S TRIAL BRIEF |
| ) | |
| MARK C. ANDERSON,        ) | |
| ) | |
| Defendant.    ) | |
| _____) | |


## I.   INTRODUCTION

This matter is set for trial on November 17, 2009, and is
expected to last approximately three weeks.  The defendant is
charged with one count of arson, four counts of interstate
transportation of fraudulently obtained property, nine counts of
mail fraud, one count of using a fictitious name in connection
with a scheme to defraud, and four counts of tax evasion.

All of these charges stem from the defendant's operation of a
wine storage business.  The indictment charges that on October 12,
2005 the defendant intentionally set fire to Wines Central, the
warehouse where he stored his client's wine.  The indictment also
charges that prior to the fire Anderson had been embezzling wine
from his clients.  The interstate transpotation counts relate to

1

four shipments of embezzled wine that Anderson sent to a wine
auction house in Chicago.  The nine mail fraud counts comprise the
checks Anderson received in payment for the embezzled wine.  The
fictitious name count relates to Anderson's use of the names
"Peter Martin" and "Joseph Throckmorten" in relation to these
shipments.  Finally, because Anderson did not declare any of the
income for wine that he embezzled and sold, he is charged with tax
evasion for the years 2001 through 2004.

II.  <u>FACTS</u>

A.  <u>Wine Embezzlement</u>

Mark Anderson, operated a business called Sausalito Cellars
that provided storage facilities for wine collectors for a fee.
Anderson had no authority to sell wine belonging to his clients.
The Sausalito Cellars website specifically stated that Sausalito
Cellars was not in the business of buying and selling wine.

In fact, Anderson had been routinely embezzling wine from his
clients since at least 2001.  In September, 2005, he was charged
by Marin County with 10 counts of embezzlement based on the
complaints of numerous clients that their wine was missing. These
clients never gave Anderson permission to sell the wine, nor did
they receive compensation for it.[1]

---

[1] The Marin prosecution relates to different wine than is the
subject of the interstate transportation/mail fraud charges
contained in the indictment, but is nevertheless relevant for a
number of reasons.  First, the undeclared income from the sale of
this embezzled wine provides the foundation for the tax evasion
charges.  Second, this wine is part of a continuous embezzlement
scheme that commenced in 2001 and continued up to and slightly
after the arson.  Third, news of the Marin County embezzlement
charges prompted many of Anderson's client to demand an accounting
or the return of their wine.

2

Several of Anderson's larger clients will testify at trial. Their testimony will recount recurring themes.  Each entrusted a quantity of wine to Anderson for storage.  None gave Anderson permission to sell or otherwise dispose of their wine.  When news about the Marin County investigation began to surface several asked for their wine back or asked to view their wine to verify that it was still there.  Anderson would usually provide some excuse such as that the wine had been temporarily misplaced. Ultimately, each victim suffered losses ranging from tens of thousands to hundreds of thousands of dollars.

Former Anderson employee Elliott Bremer will testify that he personally saw Anderson remove labels from clients' wine boxes that would identify the wine as belonging to that client. Anderson would then give these boxes to Bremer to be loaded into a van.  Bremer and Anderson would then take these boxes and sell them to either Premier Cru or Golden West International, two premium wine retailers in the Bay Area.  Bremer stated that Mark Anderson would do this about once a week.  Bremer said that Anderson told him that he was selling these wines at the request of his clients.

Representatives from both Premier Cru and Golden West will testify that they purchased wine from Anderson between 2001 and 2004.  These purchases totaled approximately $509,000 for Premier Cru and approximately $269,000 for Golden West.[2]  Two of Anderson's larger clients will testify that this wine included wine that they had entrusted to Anderson.

---

[2]  Anderson did not declare this income on either his individual or corporate tax returns.

Commencing in September, 2004, The Chicago Wine Company (TCWC), a wine auction company located in Chicago, began receiving shipments of wine from "Joseph Throckmorton" and "Peter Martin," dba Kansai Partners.  Kansai Partners is an LLC for which Anderson is 100% owner.  An Operating Agreement found during the search of Anderson's residence shows that Anderson is the only listed member and the sole contributor to Kansai Partners.  In connection with their dealings with TCWC, "Throckmorton" and "Martin" supplied three email addresses.  Investigation reveals that Anderson is the subscriber/creator of each of these accounts. Based on diligent search "Throckmorton" and "Martin" are believed to be fictitious names.  Finally, each check from TCWC to Kansai Partners in payment for the wine was mailed to a post office box held by Anderson and each check was endorsed by Anderson and deposited into accounts held by him. (Eight of the nine checks were deposited into Anderson's personal Charles Schwab account; the 9th was deposited into the Kansai Partners account).

The shipments to TCWC, which are listed below, constitute the four charges of interstate transportation of stolen property.

| Date | From | Quantity | Value |
| --- | --- | --- | --- |
| 9/29/04 | Sausalito Cellars | 45 cases | $ 13,696 |
| 5/6/05 | Wines Central | 4 pallets | 50,361 |
| 6/8/05 | Wines Central | 1 pallet | 22,760 |
| 10/5/05 | Wines Central | 5 pallets | 150,000 (Est.) |

The October 5, 2005 shipment, which consisted of about 2,600 bottles of wine, was received the day before the Wines Central fire and was flagged by TCWC because the packaging was unusual in that certain markings on the wine bottles had been obliterated or

covered up with paper.  Having also learned of the Wines Central
fire, which was big news in the wine industry, TCWC
representatives were suspicious and subsequently contacted ATF,
which took custody of wine.

Except for the 10/5/05 shipment, the wine that was shipped to
TCWC was sold at auction and resulted in the following mailings,
consisting of payment for the wine, attributable to Anderson.[3]

| Date | Check No. | Amount |
|---|---|---|
| 12/22/04 | 20952 | $8,177.20 |
| 2/9/05 | 21112 | 2,120.40 |
| 3/4/05 | 21174 | 1,627.20 |
| 3/31/05 | 21344 | 849.60 |
| 7/27/05 | 21691 | 939.60 |
| 8/23/05 | 21734 | 39,291.25 |
| 8/23/05 | 21735 | 13,497.30 |
| 10/4/05 | 21870 | 6,480.00 |
| 10/4/05 | 21871 | 817.50 |

With respect to the 10/05/05 shipment that TCWC releaseed to
ATF, Special Agent Brian Parker inventoried the contents of that
shipment, compared that inventory against the inventory of some of
Anderson's clients, and found matches for approximately 80% of the
wine.  Four of Anderson's clients whose wine comprised a large
portion of the TCWC shipment will testify at trial.  They will
identify their wine and verify that they did not give Anderson
permission to sell their wine.

---

[3] Anderson did not declare this income on either his
individual or corporate tax returns.

1    Special Agent Parker also inventoried wine that Anderson
2    moved from Wines Central to another warehouse prior to the fire.
3    He also inventoried the damaged wine that was recovered from Bay
4    14 after the fire.  Together with the TCWC shipment, this should
5    constitute the universe of wines held by Anderson on behalf of his
6    clients.  When Special Agent Parker compared these inventories
7    with those of Anderson's clients, he determined that a significant
8    amount of the client's wine could not be accounted for.

9         B.   The Arson

10        On October 12, 2005, at approximately 3:38 p.m., the Vallejo
11   Fire Department received a fire alarm for the Wines Central
12   warehouse.  The two-story, 244,000 square foot, environmentally
13   controlled warehouse housed primarily premium wine from 95 Napa
14   Valley wineries.  The defendant, Mark Anderson, also rented space
15   in the warehouse which he used to store premium wine on behalf of
16   his clients.  The warehouse was completely destroyed at a loss
17   conservatively estimated to be $200-250 million.  Over 6 million
18   bottles of premium wine were damaged or destroyed in the fire.
19   Two firefighters were injured during the fire suppression.

20        ATF's National Response Team conducted the cause and origin
21   investigation and determined that the fire was caused by arson.
22   The origin of the fire was determined to be in Bay 14, a portion
23   of the warehouse occupied only by the defendant.  As explained in
24   more detail below, Anderson was the only person working in Bay 14
25   on the afternoon of the fire and he was still there within 20-30
26   minutes before the fire was first detected by the alarm system.
27   According to the government's arson expert, this was well within
28   the ignition scenario timeframe suggested by the evidence.

At the time of the fire, Anderson was in the process of being evicted for a variety of problems including failure to pay several months of back rent.  He was actually supposed to have vacated his space by September 5, 2005, but was dragging his feet and was incurring daily penalties as a result.

On the day of the fire, Anderson was at the warehouse ostensibly to dismantle the remainder of his wine racks and remove the rest of his clients' wine.  According to the office manager, Debbie Polverino, Anderson had shown up that day sometime after 11:30 which is when she went to lunch.  After Polverino returned from lunch, Anderson was advised that, because it was a slow day, the warehouse was going to close early.  Anderson asked for a little more time and Polverino agreed.

Polverino will testify that Anderson left at approximately 3:15.  Shortly before he left, a warehouse employee passed by Anderson's storage space and noted that Anderson was the only person on the mezzanine.  At 3:18 p.m., Anderson called Polverino. The time is reflected on Anderson's cell phone bill and is consistent with Polverino's recollection that Anderson called approximately 5 to 10 minutes after he left. Polverino will testify that, when she answered the phone Anderson stated, "Oh, you're still there," and seemed surprised that she had not yet left the warehouse.  The only information that Anderson related during the one-minute call was to advise Polverino that he would return the following Tuesday to get more of his things.  Polverino considered that very unusual because Anderson never before called to tell her when or why he was going to be coming to the

warehouse.[4]

     After concluding the call from Anderson, Polverino went to get the mail.  After returning a few minutes later, she began sorting through the mail when the front door blew open.  She attempted to close the door but was only able to do so with the help of another employee.  Almost immediately after closing the door, the fire alarm began sounding.  The log for the alarm system shows that the first alarm was triggered at 3:34 p.m.  A few moments later, Polverino saw an orange glow coming from the mezzanine area of the warehouse in the vicinity of Anderson's space.

     After receiving a 911 call, the Vallejo Fire Department was dispatched at 3:38 p.m. and arrived approximately two minutes later.  First-in firefighters observed that fire appeared to be eminating from the mezzanine where the defendant's rental space was located.

     Due to the size of the fire, ATF's National Response Team (NRT) conducted the cause and origin investigation.  The NRT is composed of experts drawn from different parts of the country who have expertise in a variety of fire science disciplines.  After a careful investigation, the NRT determined that the fire had originated in Bay 14, the space occupied by Mark Anderson.  A propane torch was found at that location together with fragments of rags and cardboard pieces.  Forensic analysis also showed the presence of gasoline on the rags.  (An x-ray of the torch showed that the valve was in the closed position).  Based on these and

---

     [4]   At the time of the fire, although he had removed most of the wine from Bay 14, seven pallets still remained.

other facts, the NRT concluded that the cause of the fire was arson.[5]  The conclusions of the government's experts is consistent with Anderson being present when the fire was set.

A search of Anderson's computer revealed two deleted documents concerning how to make bombs and time bombs.  These articles also contain a discussion about destruction by fire, forensics, and arson investigation.  These documents were downloaded to Anderson's computer and posted as a shortcut on Anderson's desktop.  They were last referenced on May 13, 2005.

At around this time, Anderson was behind in the rent and had been orally informed that he would be evicted. (Anderson received formal written notice of his eviction from Wines Central on June 6, 2005).  By all accounts, Anderson did not receive the notice well and made various threats to file unmeritorious law suits.  He also demanded to be paid off or he would "make things difficult." Anderson also made veiled references about burning down Wines Central.  According to former Anderson employee Jason Greer, in May or June 2005 Anderson told Greer words to the effect that "Wines Central is old, the wood is brittle, and it would go up in flames easily.  Everything would burn up."  Greer also recalled one time when Anderson was talking about how he was upset with Jack Krystal, the owner of Wines Central, and that "it would suck for Jack if the whole place went up in flames."

---

[5] Certified Fire Investigator Dane Whetsel, the principal author of the NRT report, will testify about the cause and origin of the fire.  Fire Protection Engineer James Lord will testify about the operation of the fire detection system.  Chemist Rick Lute will testify that a partially consumed rag found at the point of origin tested positive for gasoline.

The search of Anderson's computer also revealed an article on cell phone triggers which was last accessed on September 26, 2005, just ten days before the fire.  The search also revealed that on October 18, 2005, just six days after the fire and before he had been approached by law enforcement as a potential suspect, Anderson accessed www.federalcrimes.com.

On April 4, 2007, about three weeks after the defendant was indicted on the current charges, a person with the email handle of "carlmwood" left two comments about the Wine Central arson on www.wineexpressions.com, a website about fine wine.  The comments reflect an intent by the author to focus suspicion away from the defendant and toward the owner/manager of Wines Central.  The first comment was as follows:

> Hasn't anyone ever looked into the other people at Wines Central.  Their manager there was involved in over 5,000-6,000 cases of "missing" Pride Mountain wines about ten years ago.  It was a pretty 'leaky' warehouse and all the owners were fighting over control.  More than half the warehouse was full of sugar.  They were trying to bust a union in the midwest.  It wasn't a wine warehouse, it was a front for all kinds of other business scams.  Anderson had moved out long before all this had gone.  Pacific American Consolidators just had the Marin County Courts kick them out because the current owner was being sued for fruad (sic) by his former partners for over 3 million dollars.  The building was red tagged anyway, what's the big surprise?

The second comment was:

> Jack Krystal didn't own WineCentral, he was bankrupt and needed the insurance to get out of town.  He knew nothing about wine or wineries and hired out Pacific american and Linda Hothem to bail him out.  She took off after the courts ordered her out because Krystal did not disclose how much he owed his former partners in a fraud case where he was a defendant.  All this has been covered up by the media and PR specialists at great expense to Krystal and Hothem.  Ever see their names anywhere?

10

> No way! He keeps saying he's going to re-open the
> place, but why should he, he doesn't need to and
> has no interest in the wine business.  He's just
> trying to keep the story alive so he can scam the
> insurance companies and leave the place to rot.

None of the information contained in the two comments were true.  And, as it turns out, "carlmwood" is none other than the defendant, Mark Anderson.[6]

    C.   <u>Tax Evasion</u>

As a consequence of embezzling large quantities of expensive wine, selling this wine to various wine vendors, and failing to report the income on his personal or corporate tax returns, Anderson committed tax evasion for the following years and amounts:

| Year | Unreported Income | Additional Tax Due |
|------|-------------------|--------------------|
| 2001 | $ 143,565 | $ 52,754 |
| 2002 | 237,859 | 87,852 |
| 2003 | 248,483 | 87,468 |
| 2004 | 179,045 | 62,549 |

The evidence will show that for the relevant time period, Anderson filed no personal income tax returns and only two corporate returns in which he failed to report the above income. Anderson accountant will also testify that Anderson failed to disclose the wine income from him as well.

////

---

[6] The IP address associated with "carlmwood" is assigned to mca97@pacbell.net, which is a "parent" email address on an account belonging to Mark C. Anderson.  One of the "child" email addresses associated with mca97@pacbell.net is cmw2000@pacbell.net, the email address used to send the email.

III.   LAW RELATING TO ARSON

A.   Elements

To prove arson under 18 U.S.C. §844(i), the government must show that the defendant (1) damaged or destroyed a building by fire or explosive; (2) that the building was used in or affecting interstate commerce; and (3) that the defendant acted maliciously. United States v. Triplett. 922 F.2d 1174, 1177 (5th Cir. 1991).

1.   Damaged or Destroyed By Fire or Explosive

As originally enacted, 18 U.S.C. §844(i) only covered damage or destruction of buildings by explosives.  In 1982, the statute was amended to include the words "by means of fire". Prior to this amendment, the caselaw reflects a great deal of discussion about the meaning of the term "explosive" and courts generally defined that term broadly to include conduct seemingly embraced by the "by means of fire amendment".[7]  The expansion of the statute to encompass common law arson now renders many of these problems moot.

The indictment in this case charges that the defendant damaged and destroyed Wines Central "by means of fire."  There is therefore no reason to instruct the jury on the definition of "explosives".  Therefore, the government's proposed jury

---

[7]  For example, several circuits held that uncontained air-fuel mixtures were "explosives" within the meaning of the prior statute.  See, e.g., United States v. Morrow, 717 F.2d 800, 802-03 (3d Cir. 1983)(uncontained kerosene and soaking newspapers); United States v. Lee, 726 F.2d 128, 129-30 (4th Cir. 1984) (uncontained gasoline ignited by match); United States v. Beldin, 737 F.2d 450, 454 (5th Cir. 1984)(1984)(air-fuel mixture ignited by cigerette and book of matches fuse); United States v. Agrillo-Ladlad, 675 F.2d 905, 906-07 (7th Cir. 1982)(naptha ignited by delay fuse).

instructions relating to arson do not refer to the explosives component of the statute.

2.  <u>Interstate Commerce</u>

The government is required to prove that the building that was the subject of the arson was "used in interstate or foreign commerce, or in an activity affecting interstate or foreign commerce."  18 U.S.C. §844(i).  The foregoing language describes a single jurisdictional element, not two separate offenses.  <u>United States v. Renteria</u>, 557 F.3d 1003 (9th Cir. 2009).  For that reason, the court need not instruct the jury that it must be unanimous as to this element.  <u>Id</u>.

In <u>United States v. Russell</u>, 471 U.S. 858 (1985), the court held that section 844(i) "expresses an intent by Congress to exercise its full power under the Commerce Clause" and concluded that, accordingly, the statute reaches "all business property, as well as some additional property that might not fit that description, but perhaps not every private home." <u>Russell</u> involved the destruction of rental property which, according to the Court, is unquestionably property used in an activity affecting interstate commerce because "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." <u>Id</u>. at 862.

Whether property which is destroyed by arson satisfies the jurisdictional requirement of the statute depends solely on what the property had been used for. <u>Jones v. United States</u>, 529 U.S. 848, 854 (2000); <u>United States v. Gomez</u>, 87 F.3d 1093, 1095 (9th Cir. 1996)(destruction of a multi-unit apartment building); <u>United States v. Renteria</u>, 557 F.3d 1003 (9th Cir. 2009)(destruction of

synagogue).  If the building in question is engaged in conduct
which is economic or commercial in nature even a <u>de</u> <u>minimis</u> effect
on interstate commerce is sufficient to satisfy the jurisdictional
requirement of the statute.  <u>United States v. Renteria</u>, 557 F.3d
1003 (9th Cir. 2009)(gift shop and daycare center in synagogue
satisfied interstate commerce requirement).  <u>See</u> <u>also</u> <u>United</u>
<u>States v. Martin</u>, 63 F.3d 1422 (7th Cir. 1996)(arson of vacant
rental property); <u>United States v. Sherlin</u>, 67 F.3d 1208 (6th Cir.
1995)(arson of a college dormitory); <u>United States v. Barton</u>, 647
F.2d 224, 232 (2d Cir. 1981)(arson of a building which used
heating oil from out of state sources and which contained a
business which sold orange juice and coffee from out of state);
<u>United States v. Schwanke</u>, 598 F.2d 575, 578 (10th Cir.
1979)(arson of building which contained a cafe which sold candy
and vegetables from out of state); <u>United States v. Sweet</u>, 548
F.2d 198, 202 (7th Cir. 1977)(arson of commercial fishing boat
which shipped its catch interstate).

In this case, the building that was destroyed by arson was
unquestionably used in commercial activity.  Wines Central was
engaged in the business of providing environmentally controlled
warehouse facilities for the storage of food and wine.  Ninety-
five Napa Valley wineries collectively stored over 6 million
bottles of premium wine at this location.  C&H Sugar also rented a
small space in the warehouse for the storage of sugar.

B.  <u>Mens Rea</u>

The third element that the government is required to prove is
that the defendant acted maliciously.  In analyzing the mens rea
requirement of federal criminal statutes, courts "must follow

Congress' intent as to the required level of mental culpability for any particular offense." United States v. Bailey, 444 U.S. 394, 406 (1980).  The legislative history of §844 is silent as to the intended meaning of the term "maliciously".  Nevertheless, where a federal criminal statute uses a common law term of established meaning without otherwise defining it, the term must generally be given that meaning.  Moskal v. United States, 498 U.S. 103 (1990).  In United States v. Jane Doe (R.S.W.), 136 F.3d 631, 634-35 (9th Cir. 1998), the court examined the mens rea requirement of another federal arson statute, 18 U.S.C. §81.  In that case, the Court held:

> At common law, "[a]rson is a crime of general, rather than specific intent and the requirement that the defendant acted 'wilfully and maliciously' does not mean that the defendant must have an actual subjective purpose that the act he does intentionally shall produce either (1) setting a fire or burning of the structure or (2) damage to or destruction of said structure." [Citations] "To be a wilful act, the setting of the fire must be a conscious, intentional act done knowingly and according to a purpose, as distinguished from a fire that was started by accident or defendant's involuntary act." [Citations]  "'Maliciously' means that state of mind which actuates conduct injurious to others without lawful reason, cause or excuse." [Citations]

See also Black's Law Dictionary, 4th Ed. Rev. (1968) at 1110 (Malicious: "wrongful and done intentionally without just cause or excuse".)

Accordingly, the government is not required to prove an intent to burn down a building or knowledge that this would be the probable consequences of the defendant's act.  The government need only establish that the defendant set the fire intentionally and without justification or lawful excuse.  United States v. Doe, 136

F.3d at 635.

## IV.   LAW OF MAIL FRAUD

### A.   Elements

To convict the defendants of mail fraud the government must prove the following five elements:

> (1) the defendant devised a scheme or plan for obtaining
>
> money or property by making false promises or statements;
>
> (2) the defendant knew that the promises or statements were
>
> false or fraudulent;
>
> (3) the promises or statements were material;
>
> (4) the defendant acted with the intent to defraud; and
>
> (5) the defendant used, or caused to be used, the mails
>
> to carry out or attempt to carry out an essential part of the
>
> scheme.

Ninth Circuit Model Jury Instruction 8.101.

In 1994, Congress amended the mail fraud statute to include matter sent by "any private or commercial interstate carrier." The mail fraud statute therefore covers matter delivered by Federal Express and similar organizations even where that matter travels purely intrastate.  United States v. Gil, 297 F.3d 93, 100 (2d Cir. 2002), at 4-6; United States v. Photogrammetric Data Services, Inc., 259 F.3d 229, 248 (4th Cir. 2001).  For convenience, in this brief the government will use the terms "mailings" and "use of the mails" to include matter delivered by private or commercial carrier.

### 1.   Use of the Mails

Each use of the mails in furtherance of a scheme to defraud is a separate offense.  United States v. Poliak, 823 F.2d 371, 372

(9th Cir. 1987); <u>United States v. Garlick</u>, 240 F.3d 789 (9th Cir. 2001)(applying same principle to wire fraud).  The government is not required to prove that the defendant had a specific intent to commit mail fraud; nor is it necessary to establish that the use of the mails was contemplated as part of the scheme, or that the defendant himself actually did the mailing; it is sufficient if the defendant "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended."  <u>United State v. Pereira</u>, 347 U.S. 1, 8-9 (1954); <u>United States v. Hubbard</u>, 96 F.3d 1223, 1229 (9th Cir. 1996). "The mailing can be done by a co-schemer, a co-conspirator[,] or defendant can be liable as a principal for causing the mailing of an item in furtherance of the scheme even if the mailing is done by an innocent agent."  Atkins, et al., 6 <u>Business Crimes</u>, ¶32.024 at pp. 32-36.  Thus, a letter mailed by a victim can be a mailing in execution of a fraud. <u>Schmuck v. United States</u>, 489 U.S. 705 (1989);  <u>United States v. Garlick</u>, 240 F.3d 789 (9th Cir. 2001) (victim's faxed acceptance of defendant's fraudulent offer); <u>United States v. Brutzman</u>, 731 F.2d 1449, 1454 (9th Cir. 1984). <u>United States v. Hanley</u>, 190 F.3d 1017 (9th Cir. 1999); <u>United States v. Lothian</u>, 976 F.2d at 1262 ("[t]he defendant need not have personally mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts may be reasonably foreseen.").

////

17

The mailing need not itself be false or fraudulent to be in furtherance of the scheme to defraud. United States v. Benny, 786 F.2d 1410, 1420 (9th Cir. 1986); United States v. Buckley, 689 F.2d 893, 898 (9th Cir. 1982).  Rather, the mailing need only be "sufficiently closely related to the scheme". United States v. Hubbard, 96 F.3d 1223, 1228 (9th Cir. 1996);  see also United States v. Reid, 533 F.2d 1255, 1260 n.19 (D.C. Cir. 1976)(The requirement that the mailing be in furtherance of the scheme to defraud serves only a jurisdictional purpose, assuring a reasonable connection between the scheme and the use of the federal instrumentality over which federal power exists).  In order for a mailing to be "sufficiently closely related," it must be for the "purpose of executing the scheme" or "incident to an essential part of the scheme" or "a step in the plot".  United States v. Schmuck, 489 U.S. 705 (1989);  United States v. Hubbard, 96 F.3d at 1228; United States v. Rude, 88 F.3d 1538 (9th Cir. 1996).  In Hubbard, for example, although the defendants in an odometer rollback scheme insisted that they communicated with the victims only by fax, telephone and private carriers, the court found that use of the U.S. mails by the Arizona Department of Transportation to send the vehicle titles to the victim was sufficiently related to the scheme to satisfy the mailing requirement.  The court reasoned that inability of the victims to get proper title to the vehicles would have brought the defendant's scheme to an abrupt halt.  Id. at 229.

The evidence of the use of the mails need not be direct. Circumstantial evidence, such as an office practice of mailing certain items is sufficient.  United States v. Brackenridge, 590

18

F.2d 810, 811 (9th Cir. 1979)(routine bank custom adequate to prove check was mailed); <u>United States v. Green</u>, 745 F.2d 1205, 1208 (9th Cir. 1985); but see <u>United States v. Lo</u>, 231 F.3d 471 (9th Cir. 2000)(custom and practice evidence is insufficient where there is no direct evidence that document actually existed and the absence of such evidence is not explained). Nor must the government prove that the defendant was aware of any specific mailings where the jury can infer that the defendant was aware of a practice of using the mails. <u>United States v. Jackson</u>, 61 F.3d 1386 (9th Cir. 1995).

### 2.  Scheme to Defraud

The government is not required to prove all of the acts which comprise the scheme to defraud as charged in the indictment; it is sufficient if the government proves beyond a reasonable doubt the existence of the scheme substantially as charged. <u>United States v. Rude</u>, 88 F.3d 1538, 1547 (9th Cir. 1996).  Nor is the government required to prove that anyone lost any money or property or that the scheme was successful.  <u>Id</u>.; <u>United States v. Olson</u>, 925 F.2d 1170, 1175 (9th Cir. 1991).

### 3.  Intent to Defraud

Intent to defraud is an essential element of mail fraud, but its existence may be predicated upon circumstantial evidence. <u>United States v. Nance</u>, 502 F.2d 615, 618 (8th Cir. 1974).  The government satisfies its burden of showing specific intent if it proves the existence of a scheme which was "'reasonably calculated to deceive persons of ordinary prudence and comprehension', and this intention is shown by examination of the scheme itself." <u>United States v. Green</u>, 745 F.2d 1205, 1207 (9th Cir. 1984).

Along these lines, "[i]t is immaterial whether only the most gullible would have been deceived." United States v. Hanley, 190 F.3d 1017, 1023 (9th Cir. 1999), quoting Lemon v. United States, 278 F.2d 369, 373 (9th Cir. 1960)(the wire fraud statute "protects the naive as well as the worldly-wise and the former are more in need of protection than the latter."  In fact, "the lack of guile on the part of those solicited may itself point with persuasion to the fraudulent character of the artifice."  Id., quoting Lemon.

Although ordinarily a scheme to defraud will be intended to cause loss to a victim, nothing in the language of §1341 requires proof of such intent.  Rather, the government is only required to prove that the victim was induced to part with money or property as a result of false statements or promises.[8]

Intent to defraud may be inferred from the statements and conduct of the participants in the scheme.  United States v. Beecroft, 608 F.2d 753, 757 (9th Cir. 1979).  Thus, intent to defraud may be shown by proof that the defendant: (1) knowingly made false statements, told half truths or concealed material information; (2) acted with reckless disregard for the truth; or (3) knew that the scheme operated in a deceitful manner.  Id. at 759.  The government is not required to prove that any particular false statement was made if it can demonstrate that the scheme

--------

[8] The Ninth Circuit has approved an instruction in mail fraud cases which defines "intent to defraud" as "the specific intent to deceive, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self." United States v. Simas, 937 F.2d 459, 462-63 (9th Cir. 1991)(emphasis added); United States v. Cloud, 872 F.2d 846, 852 n.6 (9th Cir. 1989); see also United States v. LeVeque, 283 F.3d 1098 (9th Cir. 2002)(citing above quoted definition with approval).

otherwise operated in a deceitful manner.  <u>United States v. Woods</u>, 335 F.3d 993, 999 (9th Cir. 2003).  In <u>Woods</u>, the Court approved the following jury instruction in a mail fraud case:

> A defendant's actions can constitute a scheme to defraud even if there are no specific false statements involved. The deception need not be premised upon words or statements standing alone. The arrangement of the words or the circumstances in which they are used may create an appearance which is false or deceptive, even if the words themselves fall short of this. Thus, even if statements as part of the scheme are not literally false, you may consider whether the statements taken as a whole were misleading and deceptive. Evidence beyond a reasonable doubt that a scheme was reasonably calculated to deceive is sufficient to establish a scheme to defraud.

335 F.3d at 997.

V. LAW RELATING TO INTERSTATE
<u>TRANSPORTATION OF STOLEN PROPERTY</u>

    A.  <u>Elements</u>

The essential elements of an offense under 18 U.S.C. § 2314 are (1) transportation of stolen property with a value of at least $5,000 through interstate commerce (2) with fraudulent intent. <u>United States v. Rosi</u>, 27 F.3d 409, 414 (9th Cir. 1994); <u>United States v. Lothian</u>, 976 F.2d 1257, 1266 (9th Cir. 1992).[9]

As used in the statute, the word "stolen" is broadly construed and includes embezzlement aswell as other theft offenses.  <u>Lyda v. United States</u>, 279 F.2d 461, 464 (5th Cir. 1960)("Congress by the use of broad terms was trying to make clear

---

[9]  In <u>United States v. Pereira</u>, 347 U.S. 1, 9 (1954), the Court described the two elements as (1) knowledge that certain property has been stolen or obtained by fraud, and (2) transporting it, or causing it to be transported in interstate commerce.

that if a person was deprived of his property by unlawful means amounting to a forcible taking or a taking without his permission, by false pretense, by fraud, swindling, or by a conversion by one rightfully in possession, the subsequent transportation of such goods in interstate commerce was prohibited as a crime.")

Sections 1341 and 2314 of Title 18 constitute two separate offenses, and a defendant may be convicted of both even though the charges arise from a single act or series of acts, so long as each requires the proof of a fact not essential to the other. United States v. Pereira, 347 U.S. 1, 9 (1954).

VI.   LAW RELATING TO INCOME TAX EVASION

A.   Definition

Title 26, United States Code, Section 7201, provides in pertinent part:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony....

Section 7201 describes two separate and distinct crimes: (1) the willful attempt to evade or defeat assessment of a tax, and (2) the willful attempt to evade or defeat payment of a tax. Sansone v. United States, 380 U.S. 343, 354 (1965); United States v. Dack, 747 F.2d 1172, 1174 (7th Cir. 1984). The first type of offense is ordinarily committed when the taxpayer files a return which omits income or claims deductions to which he is not entitled. In the second type of offense, the assessment is not the issue because an assessment has already been made, either by the taxpayer or by the IRS. The second type of offense ordinarily involves concealment of the taxpayer's ability to pay or the removal of assests from

the reach of the IRS.  Because this case involves the first type
of offense under Section 7201, further discussion will be confined
to that type.

B.  Elements

To establish a violation of 26 U.S.C. §7201, the government
must establish the following elements:

(1)  The existence of a tax deficiency;

(2)  Willfulness in attempted evasion of taxes;
     and

(3)  An affirmative act constituting an evasion
     or attempted evasion.

United States v. Sansone, 380 U.S. 343 (1965); United States v.
Marabelles, 724 F.2d 1374, 1377 (9th Cir. 1984).

1.  Tax Deficiency

In this case, the government intends to show the tax
deficiency by the specific items method of proof - that is, the
government will produce evidence of specific items of reportable
income by the defendant which do not appear on his tax return or
which appear in diminished amount.  United States v. Marabelles,
724 F.2d at 1377 n.1.  Unlike indirect methods of proof, the
government is not required to negate the possibility that bank
deposits or cash expenditures originated from non-taxable
sources.[10]  United States v. Black, 843 F.2d 1456, 1459 (D.C. Cir.

---

[10] In indirect proof cases, such as the "net worth" or "bank
deposits/bank expenditures" methods, the government must prove
that the increased wealth did not come from non-taxable sources.
Otherwise, there is the possibility that the defendant may be
convicted because non-taxable income is mistakenly presumed to be
taxable income, or because cash expenditures are mistakenly
assumed to be made from taxable income.  See United States v.
Black, 843 F.2d 1456, 1458-59 (D.C. Cir. 1988).  Consequently, in
indirect proof cases, the government must establish, among other

1988).  Likewise, the government is under no obligation to follow

all "reasonable leads" as in the indirect method of proof cases,

United States v. Marabelles, 724 F.2d at 1379 n.3, and the burden

is on the defendant to show that he had allowable deductions that

were not shown on his return.  Id.

### 2.  Willfulness

Willfulness requires the showing of a specific wrongful

intent to avoid a known legal duty.  United States v. Marabelles,

724 F.2d at 1379.  Although direct proof of a taxpayer's intent to

evade taxes is rarely available, willfulness may be inferred by

the trier of fact from all the facts and circumstances of the

attempted understatement of tax.  Id.

### 3.  Affirmative Acts

In United States v. Spies, 317 U.S. 492, 500 (1943), the

Court stated:

> By way of illustration, and not by way of limita-
> tion, we would think affirmative willful attempt
> may be inferred from conduct such as keeping a
> double set of books, making false entries of
> alterations, or false invoices or documents,
> destruction of books or records, concealment of
> assets or covering up sources of income, handling
> of one's affairs to avoid making the records usual
> in transactions of the kind, and any conduct, the
> likely effect of which would be to mislead or to
> conceal. If the tax-evasion motive plays any part
> in such conduct the offense may be made out even
> though the conduct may also serve other purposes
> such as concealment of other crime.

The Ninth Circuit echoed that sentiment in United States v.

Edwards, 375 F.2d 862, 865 (9th Cir. 1967):

_____

things, the amount of cash the defendant had on hand at the start
of the period and negate the possibility that bank deposits or
cash expenditures originated from non-taxable sources.  Id.

24

The <u>Spies</u> list of illustrations . . . may be read
to suggest that the required acts of commission
should be of such a character as is likely to
mislead or conceal, and thus to hinder detection;
that they should do more than is done by a simple
omission, which merely interferes with the volun-
tary system of reporting established by the Code
and puts the Government to the task of ascertaining
tax liability; that they should, by deception,
serve to frustrate the Government in accomplishing
that task.

But this is to read the <u>Spies</u> illustrations out of
context and to disregard the explicit warnings that
accompany them . . .

It was not intended, then, to establish a hierarchy
of attempts or evasions and limit § 7201 to those
of a more deceitful or troublesome character. An
affirmative willful act which in any manner serves
the purpose of evasion is all that is required.

In this case, the defendant created front entities (Kansai
Partners) and fictitious people (Peter Martin and Joseph
Throckmorten).  He falsely told businesses to whom he sold wine
that he did so on the authority of his clients and represented
that he derived only a small commission or broker's fee.  He
repeated this to his accountant/tax preparer.  In some cases, he
requested that checks for wine purchases be directed to a creditor
(e.g., his dentist).  And finally, he burned down Wines Central.
To be sure, these were all affirmative acts to conceal his
embezzlement of his client's wine, but they also "served the
purpose of evasion."  <u>Edwards</u>, 375 F.2d at 866.

VII.  <u>ADDITIONAL EVIDENTIARY ISSUES</u>

A.  <u>Government's Use of Summary Witness</u>

As part of its case in chief the government intends to call
ATF Auditor Ariane Lyons and IRS Special Agent Erica Britton to
summarize the contents of Anderson's bank records.  Each witness
will trace the money Anderson derived from the sale of his client's

25

wine.  To lay a proper foundation for their testimony, and in the absence of a stipulation from the defendant, the government will call custodians of record for the respective banks to authenticate the records for which Ms. Lyons and Ms. Britton will be testifying.

As previously indicated, the government also intends to call Special Agent Brian Parker to testify about his inventory of the remainder of Anderson's wine and his comparison of that inventory to client inventories.

Federal Rule of Evidence 1006 provides that "the contents of voluminous writings, recordings or photographs which cannot be conveniently examined in court may be presented in the form of a chart, summary or calculation".  The Ninth Circuit has recognized that summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses." United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir. 1989), quoting United States v. Lemire, 720 F.2d 1327, 1348 (D.C. Cir. 1983); see also United States v. Meyers, 847 F.2d 1408, 1412 (9th Cir. 1988)(Approving the use of a summary witness where the sequence of events was confusing and the chart contributed to the clarity of presentation).

Although the underlying materials upon which the summary testimony is based must be "admissible," they need not be actually admitted into evidence.  United States v. Meyers, 847 F.2d at 1412. The foundation for admission of such a summary is simply that the records are voluminous and that in-court examination would be inconvenient. United States v. Duncan, 919 F.2d 981, 988 (5th Cir. 1990).  Like this case, Duncan was a mail fraud and conspiracy case involving several individuals who were charged with defrauding

insurance companies over a period of years by staging accidents and submitting numerous false claims.  At trial, an agent with the FBI summarized the voluminous insurance company records pertaining to claims submitted by the defendants.  The Fifth Circuit Court of Appeals ruled that the agent's testimony, and accompanying summary charts, were properly admitted under Rule 1006. Duncan, 919 F.2d at 988.

Similarly, in United States v. Osum, 943 F.2d 1394, 1405 (5th Cir. 1991), the defendant was charged with conspiring to commit mail fraud in a scheme involving fraudulent accident claims while he was employed as a bus driver for the New Orleans Regional Transit Authority.  At trial, a government witness "synthesized various documentary information from the three accidents" including bus company files, drivers' reports, supervisors' reports, claim adjustors' reports, and medical reports. The Court held that admission of the testimony of such a summary witness was well within the trial court's discretion under FRE 1006. See also Goldberg v. United States, 789 F.2d 1341, 1343 (9th Cir. 1986)(Summary testimony of IRS agent concerning voluminous records admissible).

DATED:   November 10, 2009

                              BENJAMIN B. WAGNER
                              United States Attorney

                         By: s/R. Steven Lapham
                              R. STEVEN LAPHAM
                              Assistant U.S. Attorney