STEPHANIE M. ADRAKTAS (No. 215323)
Attorney at Law
2625 Alcatraz Avenue, #233
Berkeley, CA 94705
Telephone (415) 699-1507
stephanieadraktas@att.net

Attorney for Defendant
MARK ANDERSON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, | NO. 2:07-CR-00096-KJM-EFB |
| Plaintiff, | DEFENDANT MARK ANDERSON'S SECOND RENEWED MOTION FOR COMPASSIONATE RELEASE |
| v. | |
| MARK ANDERSON, | |
| Defendant. | Telephonic Hearing Requested |
| | Judge: The Honorable Kimberly Mueller, Chief United States District Judge |

**Second Renewed Motion for Compassionate Release**

Defendant Mark Anderson respectfully submits this renewed motion for compassionate release. On January 6, 2021 this Court denied his initial motion for compassionate release. Dkt. No. 289. The Court noted that the denial was based on the current record. Dkt. No. 289, p. 8. On September 16, 2021, the Court denied Mr. Anderson's first renewed motion for compassionate release on grounds that he was required to engage in additional exhaustion. Dkt. No. 305.

After receiving the most recent order, Mr. Anderson submitted a new administrative request for compassionate release to the Warden at Terminal Island. The request was

Defendant's Second Renewed Motion for Compassionate Release *United States v. Anderson*,
No. 2:07-CR-00096-KJM-EFB
1

1  submitted on September 17, 2021. Thirty days has passed and Mr. Anderson has not

2  received a response. Accordingly, his renewed motion for compassionate release is fully

3  exhausted. Exh. 8.

4       Mr. Anderson has been hospitalized after his original motion was denied and he has

5  been diagnosed with two new serious medical conditions (congestive heart failure and

6  kidney disease) that increase the likelihood of serious illness or death due to COVID-19.

7  Moreover, as set forth in more detail below, the Warden at Terminal Island has recently

8  declared that the institution will be operating under "Code Red" COVID-19 restrictions. Mr.

9  Anderson reports that the Code Red status has been changed at times and that the prison is

10  now desperately overcrowded. For all of these reasons, Mr. Anderson requests that this

11  Court conduct a video or telephonic hearing and grant his motion for compassionate release.

12       Moreover, Mr. Anderson has experienced symptoms of "long haul" COVID-19

13  including pneumonia, mental confusion, repeated bouts of severe coughing and tremors. He

14  remains at risk of reinfection with COVID-19, as elderly and obese people like him have

15  suffered reinfections even after being vaccinated. Moreover, he has worked with a social

16  worker to create a more robust release plan. Accordingly, as set forth in more detail below,

17  Mr. Anderson should be granted compassionate release.

18       As the Court is familiar with Mr. Anderson's case, this renewed motion will not

19  repeat the facts set forth in the previous pleadings. He asks to incorporate the facts and

20  previous arguments set forth in his previous motions and reply briefs. Dkt. Nos. 277, 287,

21  297, 292.

22       **1.    Mr. Anderson's Poor Health Has Continued to Deteriorate**

23       The government has acknowledged that, due to his "health profile," Mr. Anderson is

24  at "high risk" of serious illness due to COVID-19. Docket No. 285, p. 13. Specifically,

25  because of Mr. Anderson's age (72) and his serious health conditions (including a

26  respiratory disorder, obesity and heart disease), he meets the threshold criteria for

27

28       Defendant's Second Renewed Motion for Compassionate Release *United States v. Anderson*, No. 2:07-CR-00096-KJM-EFB

2

compassionate release under 1B1.13 of the Guidelines. *Id.* at 9. Moreover, the government concedes that Mr. Anderson has a serious physical or medical condition that substantially diminishes his ability to provide self care within the correctional environment, and "from which he   . . is not expected to recover." Docket No. 285 at 9.

There are additional extraordinary and compelling reasons to release Mr. Anderson because his severe pre-existing health conditions have continued to deteriorate. In addition to his long-haul COVID symptoms, he continues to suffer from high blood pressure, atrial fibrillation, chronic obstructive sleep apnea, severe chronic pain arising from injuries he sustained in a train accident, chronic staph infections and cellulitis. Moreover, he states that he has been newly diagnosed with chronic immunodeficiency syndrome. He is also a cancer survivor and he should be receiving regular cancer screens, which have not been occurring while he has been in the BOP. Most recently, he has been suffering from recurrent and severe leg infections.

In April, 2020 Mr. Anderson suffered a serious case of COVID-19. He was transported from the prison by ambulance and hospitalized. Since Mr. Anderson was deemed to have recovered, he has suffered numerous symptoms of "long haul" COVID-19, including "brain fog" (lack of memory that persists) shakes and tremors and for which he was prescribed medication and fevers/chills. Exh. 1, pp. 1-5, 29, 216. He reports that he has been very ill with pneumonia symptoms, with bouts of uncontrollable coughing and shortness of breath. His statements are corroborated by his medical records, with notes that he had pneumonia with severe coughing, fever and shortness of breath, tremors and an "unspecified" respiratory disorder." Exh. 1, pp. 2-5, 127, 181, 215, 216, 221. During February and early March of this year, Mr. Anderson states that he was "in and out of the hospital" with pneumonia and infections. On April 5  2021, he had a fever of 103-104 degrees. Exh. 1, p. 216. These symptoms are associated with "long haul" COVID-19. See Declaration of Dr. Tara Vijayan, ¶ 29. Exh. 2; "*Terrifying post-COVID syndrome is next*

1  *focus of researchers in Bay Area and beyond*" San Francisco Chronicle (February 22, 2021)

2  Exh. 3.

3      On April 10, 2021 Mr. Anderson reported that he was again being treated at the

4  Terminal Island hospital and was confined to his bunk due to recurring staph infections in

5  his legs and recurrent pneumonia.

6      On April 26, 2021 Mr. Anderson reported that his new BOP physician had suggested

7  he suffers from a chronic immunodeficiency syndrome. That is a chronic lack of white blood

8  cells and other markers, which indicate that his body is not able to fight disease as efficiently

9  as would be expected. That diagnosis does not appear in the medical records provided to

10 counsel, although the records appear to be incomplete.

11     Moreover, BOP physicians cut Mr. Anderson's dose of pain medication in half. He

12 has suffered from severe chronic pain, due to injuries suffered in a train accident, for more

13 than twenty years. As verified by his medical records, the BOP physicians reduced Mr.

14 Anderson's pain medications and substituted Suboxone, which is not a treatment for pain.

15 Exh. 1, p. 6, 22-23. After enduring weeks of unrelenting pain, Mr. Anderson was able to get

16 his pain medication restored. Mr. Anderson reports that he was in such excruciating pain

17 that he was unable to walk. Exh. 1, p. 243.

18     **2.      Conditions at Terminal Island Remain Grim**

19     Mr. Anderson's circumstances are even more urgent given the conditions at FCI

20 Terminal Island, where he is currently incarcerated. According to the BOP website, over the

21 course of the pandemic, 486 inmates at Terminal Island have been infected with the

22 COVID-19 virus. Ten of them died in custody. The website states that one inmate is

23 currently infected along with one staff member. [1]

24

25

26     [1]    https://www.bop.gov/coronavirus/

27     Defendant's Second Renewed Motion for Compassionate Release *United States v.*

28     *Anderson*,
       No. 2:07-CR-00096-KJM-EFB
       4

However, the news media has reported that the number of infected inmates at Terminal Island has been far higher than has been reported by the BOP. On May 5, 2020 the Los Angeles Times reported that in fact 623 inmates at Terminal Island had tested positive for COVID-19. "*6th Terminal Island prisoner dies of COVID-19; Congresswoman says Fauci's "a little alarmed*" Los Angeles Times. Exh. 4. On May 12, 2020 it reported that more than 700 had tested positive. "*After seventh coronavirus death at Terminal Island, Congresswoman says inmates lack protection*" Los Angeles Times, Exh. 5. Because the BOP appears to be understating the extent of the spread of COVID-19 within the institution, it is not possible to rely on its public statements concerning the current conditions there.

Moreover, the American Civil Liberties Union has sued Terminal Island, claiming that the warden has been deliberately indifferent to the risk of death and serious illness caused by COVID-19 and has failed to provide a clean environment and basic sanitary supplies. "*Officials mishandled coronavirus outbreaks at Lompoc, Terminal Island prisons, lawsuits claim*" Los Angeles Times (May 17, 2020) Exh. 6. The unsafe conditions at Terminal Island and the significant risks they pose to Mr. Anderson constitute a extraordinary and compelling reason for compassionate release.

**3.    Because He is Obese, Over 65 and Medically Fragile, Mr. Anderson Remains At High Risk Even Though He Has Been Vaccinated Against COVID-19**

At  6 feet tall and about 300 pounds, with a BMI of 40.7,  Mr. Anderson is, clinically obese. See Exh. 1, p. 150; PSR p. 2. According to the CDC, individuals with a "body index [BMI] of 30 or higher," of any age, "are at increased risk of severe illness from COVID-19." Obesity is "one of the most important predictors of severe coronavirus illness[.]" Individuals with a BMI between 30 and 34.9 had an "increased risk of respiratory failure, and ICU

1   admission." [2] *See also United States v. Jenkins*, 460 F. Supp. 3d 1121, 1129 (D. Colo . May
2   8, 2020) (citing studies concluding that "'the chronic condition with the strongest
3   association with critical illness was obesity, with a substantially higher odds ratio than any
4   cardiovascular or pulmonary disease.'")(internal citation omitted).

5        District courts have granted compassionate release for inmates with similar health
6   profiles. *See United States v. Gonzalez*, No. 17-CR-2054-GPC, 2021 WL 37728, at *5 (S.D.
7   Cal. Jan. 5, 2021) (granting motion for reduction in sentence because "Gonzalez's obesity
8   puts him at increased risk of severe illness should he contract COVID-19"); *United States v.*
9   *Miles*, No. 2:17cr127, 2020 WL 7646415, at *2 (E.D. Cal. Dec. 23, 2020) (given COVID
10  risks, "obesity alone can support a motion for compassionate release"); *United States v.*
11  *Tamasoa*, No. 2:15cr124, 2020 WL 6700416, at *3 (E.D. Cal. Nov. 13, 2020) ( "District
12  courts within the Ninth Circuit have recognized obesity greatly increases the risk of serious
13  COVID-19 symptoms and complications and have granted motions for compassionate
14  release to inmates with a body mass index within the 'obese' range.")

15       Although Mr. Anderson has received two doses of COVID-19 vaccine, he remains at
16  risk of reinfection due to his age, poor health and very well documented morbid obesity. See
17  Declaration of Dr. Tara Vijayan, Exh. 2, ¶ 31 (efficacy of COVID-19 vaccines in elderly and
18  obese people is unknown; historically certain vaccines are less effective in those
19  populations); "*CDC Identifies Small Group of COVID-19 Infections Among Fully*
20  *Vaccinated Patients*" Wall Street Journal (April 15, 2021) Exh. 7. Moreover, even before
21  the COVID-19 pandemic, studies had demonstrated that obese people who had received
22  influenza vaccines were at two times greater risk of thereafter developing influenza or

23

24  _____

25       [2]  Matteo Rottoli, et al., Obesity and COVID-19, European Journal of
    Endocrinology, July 1, 2020, available at: https://eje.bioscientifica.com/view/journals/
26  eje/aop/eje-20-0541/eje-20-0541.xml.

27  Defendant's Second Renewed Motion for Compassionate Release *United States v.*
    *Anderson*,
28  No. 2:07-CR-00096-KJM-EFB

influenza-like illnesses. [3] [4]

Most recently, there have been reports of numerous "breakthough" cases where vaccinated individuals have become ill with COVID-19. "*California reveals how many breakthrough cases after vaccination have ended in death*" San Francisco Chronicle (May 12, 2021) Exh. 10. Ultimately, the scientific evidence as to COVID-19 vaccines suggests that Mr. Anderson will not enjoy the same level of immunity as a non-obese vaccinated person. Moreover, even healthy people have become ill after being vaccinated.

In addition, it is unclear whether the immune response from vaccination will be long lasting. See Declaration of Dr. Tara Vijayan, Exh. 2, ¶¶ 30, 33 ("We do not know how long the immune response from the vaccine series will last.") Moreover, although California has experienced a promising drop in cases after January's highs, "some states, especially on the East Coast, have struggled for weeks to make any progress in reducing cases."  J. Bosman & M. Smith, *U.S. Rushes to Expand Covid Vaccine Eligibility in a 'Race Against Time*, N.Y. Times (Mar. 19, 2021).

With hotspots emerging again,"disease experts [are] warn[ing]that the spread of a more dangerous variant and a too-rapid rush to return to normal life could prolong the historic health emergency." J.Achenbach, A.Eunjung Cha & J.Dupree, *After weeks of*

---

[3] "Host Factors Impact Vaccine Efficacy: Implications for Seasonal and Universal Influenza Vaccine Programs," Journal of Virology. Exh. 8.

[4] Pfizer vaccine may be less effective in people with obesity, says study, The Guardian (February 28, 2021) https:llwww.theguardian.comlworldl2021/feb/28/pfizer-vaccine-less-effective-obesity-study; America's Obesity Epidemic Threatens Effectiveness of any COVID-19 Vaccine, Kaiser Health News (August 6, 2020) at https://lkhn.orginews/americas-obesity-epidemic-threatens-effectiveness-of-any-covid-vaccine/.

 https:lljamanetwork.comljoumalsljamalfullarticleI2768351 (discussing need for patient monitoring after recovery from COVID-19 due to long-term persistence of symptoms).

Defendant's Second Renewed Motion for Compassionate Release *United States v. Anderson*,
No. 2:07-CR-00096-KJM-EFB
7

*declining cases, echoes of hot spots emerge in Upper Midwest, New York City area*, Wash. Post (Mar. 16, 2021). Because of obesity's effect on immune function, and because any immunity to the wild type of Covid-19 may not provide protection from the new variants, Mr. Anderson is not safe even though he has been vaccinated.

Ultimately, because Mr. Anderson has already been hospitalized for life-threatening COVID-19 pneumonia and because he has suffered from similar long-haul symptoms for months afterward, he is still facing an extreme risk of continued illness and of further infection with a COVID-19 variant. For similar reasons, district courts have been continuing to order compassionate release for inmates like Mr. Anderson, who have received vaccinations for COVID-19. *See United States v. Bozon Pappa*, No. 95-00084-CR, 2021 WL 1439714, at *4 (S.D. Fla. Apr. 1, 2021)(granting CR even though she "has eceived a COVID-19 vaccine, [Ms. Bozon Pappa] submitted evidence that the vaccine may not be completely effective in persons with obesity");*United States v. Parish*, 2:07-CR-578-RMG, D.E. 158 at 4-5 (D.S.C. Mar. 17, 2021) (granting compassionate release based on COVID-19 risk factors, notwithstanding receipt of first vaccine dose); *United States v. White*, No. 3:17-CR-00104-2, 2021 WL 268719, at *4 (M.D. Tenn. Jan. 27, 2021) (granting CR despite vaccinations underway and noting that "just this month variants to the SARS-CoV-2 strain were identified that may (or may not) allow the virus to spread more quickly, lead to "more severe or less severe illness," and "evade vaccine-induced immunity."); *United States v. Hatcher*, No. 18 CR. 454-10 (KPF), 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021)(granting compassionate release to fully vaccinated woman, based on the extreme conditions of confinement during the pandemic).

**4.      Mr. Anderson Should Be Released to a Group Home or Half Way House**

This Court's order denying Mr. Anderson's motion for compassionate release states that the lack of detail in his release plan was a cause for concern. Dkt. 289 at p. 8. Since then, Mr. Anderson has continued to work with a social worker to create a more robust

release plan. Because Mr. Anderson does not have a relative or friend that he can live with upon his release and because he has special medical needs, his social worker has identified a room and care group home placement in the community that could accept him upon his release. In the alternative, Mr. Anderson proposes that he be released to a Residential Re-entry Center ("RRC") or halfway house.

The social worker supporting Mr. Anderson's release plan, Ms. Maureen Paley, has identified a housing option that will support his needs in the short and long term. Specifically, Ms. Paley has confirmed a vacancy for a male resident at an all-male room and care facility in East Sacramento that is about four miles from U.C. Davis Medical Center, where Mr. Anderson could obtain medical care for his  chronic injuries and pain as well as his other medical conditions. The facility's manager has been providing room and care housing services for a total of 17 years.

Ms. Paley stated that "The manager described the current residents as within the same age group as Mr. Anderson (70's) and also a group with consistent residence there, one resident having been there for 11 years. This housing option provides three meals per day, in addition to In Home Supportive Services (IHSS) workers that come to the home on a regular basis to support the residents with activities of daily living within the home and also with transportation to appointments and for errands."

The manager also shared with Ms. Paley that the property is drug and alcohol free and includes audio and video cameras inside and outside of the home to support security and safety of the residents. The monthly rate for the room and care facility is $850 per month, and the Saint Vincent De Paul Society in West Sacramento, CA has committed to supporting Mr. Anderson's first and second month's rent, which will allow him to get his Social Security Disability Income (SSDI) reinstated. With an SSDI benefit of approximately $1200 per month, Mr. Anderson will have the means to cover his rent, meals and extra lifestyle related costs as needed.

1    Ms. Paley has also confirmed with Terminal Island staff that the team there will

2 support Mr. Anderson's transportation needs to Sacramento upon the court's determination

3 of his release from custody. Once Mr. Anderson arrives in the Sacramento area, his defense

4 team can arrange for him to get to the room and care facility.

5    At this point, Mr. Anderson and Ms. Paley have made all of the arrangements that

6 could be made while he is still in custody and does not have an order granting

7 compassionate release or a firm release date. They could secure an appropriate placement if

8 the court were to order compassionate release. Moreover, Mr. Anderson has demonstrated

9 that he is a diligent person who will be able to overcome any difficulties he encounters.

10    Finally, Mr. Anderson will have social, emotional and practical supports if he were

11 released to the community. He has enjoyed a twenty-eight year relationship with his

12 companion, Cynthia Witten. Mr. Anderson and Ms. Witten have maintained a  close

13 relationship throughout his incarceration. She cannot offer to house him upon his release for

14 personal reasons. However, she would be available to provide emotional and practical

15 support when needed.

16    Ms. Gloria Ballerino has spoken with undersigned counsel by phone about her very

17 long friendship with Mr. Anderson. Ms. Ballerino has known Mr. Anderson for 55 years.

18 She and Mr. Anderson have exchanged correspondence while he has been incarcerated and

19 she has visited him from time to time. Ms. Ballerino is very fond of Mr. Anderson and she

20 knows him to be a very hard working person who has made many contributions to his

21 community as a volunteer. She has also offered to provide Mr. Anderson with social and

22 practical support when needed upon his release. Exh. 9.

23    Moreover, despite his disabilities Mr. Anderson is ready and able to accept

24 employment doing clerical or other work that is not physically demanding. While in prison,

25 he has taught art classes and he is also a talented artist. Moreover, at age 72, he will receive

26 Social Security income and Medicare.

27

28
Defendant's Second Renewed Motion for Compassionate Release *United States v.*
*Anderson*,
No. 2:07-CR-00096-KJM-EFB
10

1    In other cases, inmates who could not propose a more detailed release plan were
2    granted compassionate release, with a proposed placement at a Reentry Center or Halfway
3    House. *See United States v. Cole*, 479 F.Supp.3d 996, 1002 (D. Or. 2020); *United States v.*
4    *Dana*, 467 F.Supp.3d 962, 966 (D. Or. 2020).

5    Ultimately, the uncertainty of compassionate release has impacted counsel's ability
6    to arrange community resources or secure a firm placement in transitional housing.
7    The Office of the Federal Public Defender has provided advice and assistance and Mr.
8    Anderson's social worker has found community organizations willing to assist with Mr.
9    Anderson's transition, such as the room and care home, but pre-release planning cannot be
10   finalized unless there is an upcoming release date.

11   If this Court requires a more concrete re-entry plan, Mr. Anderson proposes the
12   approach taken by the court in *United States v. Quinn*, 3:91-cr-608, ECF No. 133 (N.D. Ca.
13   June 17, 2020). In *Quinn*, the court granted compassionate release to a defendant who was
14   60 years old and 28 years into a 46-year sentence for two armed bank robberies. When the
15   Court granted the motion, it ordered the defendant to prepare and submit a re-entry plan,
16   suggesting that he work with the Probation Office to identify a proposed residence upon
17   release and describe how he would transport himself to that location upon his release from
18   the BOP. The Court stated that if the re-entry plan was acceptable, Quinn would be released
19   and if it was not satisfactory, he would be given an opportunity to revise it with guidance
20   from the Court.

21   The plan ultimately approved in *Quinn* stated that the defendant would live in a
22   residential hotel for several months upon his release, obtain health insurance, engage in
23   rehabilitative programming and then transition to a Residential Reentry Center when a bed
24   became available. *Quinn*, 3:91-cr-608, ECF No. 135 (N.D. Ca. June 25, 2020).

25   In the instant case, a similar order would allow Mr. Anderson to obtain assistance
26   from the Probation Office and other providers and prepare a release plan with a specific

27
28

residential placement and a plan for reentry. Mr. Anderson respectfully request that the Court consider the approach adopted in *Quinn* and issue an order granting compassionate release, referring him to the Probation Office and scheduling a date for presentation of his reentry plan.

**5.      Conclusion**

Mr. Anderson's age and health conditions place him at high risk of serious complications or death due to COVID-19. He is also unable to engage in necessary self care to avoid COVID-19 infection in prison. Moreover, he has suffered symptoms of long haul COVID-19 and he remains at risk of reinfection because of his age and obesity. Because of this and the fact that he is otherwise eligible for compassionate release under 18 U.S.C. § 3582 and USSG § 1B1.13, app. n. 1(D), a sentence reduction to time served is consistent with the factors set forth in 18 U.S.C. § 3553(a). The Court should reduce Mr. Anderson's term of imprisonment to time served, and order his release.

DATED this 22nd day of October, 2021.

Respectfully Submitted,
/ s / STEPHANIE M. ADRAKTAS
State Bar #215323
Counsel for Defendant
Mark Anderson